UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  06/14/2024
```

POWX INC.,

                  Plaintiff,

          -against-

PERFORMANCE SOLUTIONS, LLC,

                  Defendant.

24-CV-01389 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

On February 23, 2024, Plaintiff PowX Inc. ("PowX") initiated this action by complaint against Defendant Performance Solutions, LLC ("Performance Solutions") for a declaratory judgment of non-infringement and patent invalidity with respect to U.S. Patent No. 9,656,112 (the "'112 Patent") owned by Performance Solutions. *See* Dkt. No. 1. PowX subsequently amended its Complaint twice, first on February 23, 2024 and then on April 3, 2024. *See* Dkt. Nos. 3, 9 (the "Complaint" or "Cplt."). On April 10, 2024, before having been served by Plaintiff with the operative Complaint, Performance Solutions appeared in this matter to Answer and Counterclaim (*see* Dkt. No. 14), and to move for a Preliminary Injunction (*see* Dkt. Nos. 15, 16, together the "PI Motion," or "Mot.") seeking to restrict PowX from engaging in activities infringing on the '112 Patent and four additional patents, U.S. Patent Nos. 9,345,921 (the "'921 Patent"); 9,539,167 (the "'167 Patent"); 10,278,890 (the "'890 Patent"); and 10,695,260 (the "'260 Patent") (collectively with the '112 Patent, the "Asserted Patents," and each an "Asserted Patent"). Following complete briefing, oral argument, and an evidentiary hearing, Performance Solutions' PI Motion is now before the Court for decision.

For the reasons set forth below, Performance Solutions' Motion for Preliminary Injunction is hereby GRANTED.

1

## BACKGROUND

### I.    FACTUAL BACKGROUND[1]

#### A.  The Parties, the Licensee Products, and the Accused Product

Performance Solutions is a Massachusetts Limited Liability Company that is the owner and assignee of all five Asserted Patents.  Performance Solutions was founded by Kipp K. Dye, who is a licensed and practicing physical therapist and the President of OrthoSportsMED™ Physical Therapy, an outpatient physical therapy organization that specializes in orthopedics and sports physical therapy.  In the course of Mr. Dye's physical therapy work, he recognized a need for a device that could extend into his patients' soft tissue in order to increase their flexibility and mobility.  In an effort to meet this need, he developed a portfolio of patents on, essentially, portable cylindrical foam rollers with projections designed to manipulate soft tissue.  Mr. Dye's foam roller patents are assigned to Performance Solutions, and Performance Solutions, in turn, licenses those patents to various businesses that produce and sell textured foam rollers to consumers.  These licensees include Halcyon Brand Services Inc. and 321 Holdings, which market, distribute, and sell foam rollers under the 321 Strong brand ("321 Strong Rollers"), and Implus Footcare LLC, which markets, distributes, and sells foam rollers under the TriggerPoint

---

[1] Except as otherwise noted, the factual background described below derives from the facts as set forth by the parties in the Complaint (Dkt. No. 9), the Counterclaims (Dkt. No. 14), and the papers and accompanying declarations and exhibits provided in support or in opposition to the PI Motion.  These include the Declarations of Kipp K. Dye ("Mr. Dye"), Ryan Abbott ("Dr. Abbott"), Lawrence G. Copley ("Mr. Copley"), Justin V. Lewis ("Mr. Lewis"), Christopher Scott ("Dr. Scott"), and Ashe P. Puri ("Mr. Puri") offered in support of the PI Motion (*see* "Dye Decl.," Dkt. No. 16-1; "Abbott Decl.," Dkt. No. 16-2; "Copley Decl.," Dkt. No. 16-3; "Lewis Decl.," Dkt. No. 16-4; "Scott Decl.," Dkt. No. 16-5; "Puri Decl.," Dkt. No. 16-6; "Supp. Scott Decl.," Dkt. No. 24-1; and "Supp. Dye Decl.," Dkt. No 24-2) and the declarations of Abe Kopolovich ("Mr. Kopolovich") and Sandra A. Hudak ("Ms. Hudak") offered in opposition the PI Motion (*see* "Kopolovich Opp. Decl.," Dkt. No. 21; "Hudak Opp. Decl.," Dkt. No. 22).  The Court also held a Preliminary Injunction Hearing over the course of two days, May 2, 2024 and May 22, 2024 (the "PI Hearing"), during which counsel for Performance Solutions and PowX presented argument and four of Performance Solutions' witnesses—Mr. Dye, Dr. Abbott, Mr. Lewis, and Dr. Scott—provided testimony. *See generally* Transcript of May 2, 2024 Hearing (hereinafter "May 2, 2024 Tr."); Transcript of May 22, 2024 Hearing (hereinafter "May 22, 2024 Tr.").  No further individualized citations to these documents will be made herein except as specifically quoted or referenced.

brand ("TriggerPoint Rollers"; together with 321 Strong Rollers, the "Licensee Products").  321 Strong Rollers and TriggerPoint Rollers are sold on the third-party online sales platform Amazon.com, Inc. ("Amazon").

PowX is a New York corporation that sells a variety of exercise-related products on Amazon.  Among these products are foam rollers identified as "Textured Foam Rollers for Muscle Massage" (the "Accused Product"), which is offered in both "High-Density" and "Medium-Density" specifications and is sold under various Amazon Standard Identification Number ("ASINs").  *See* Counterclaims ¶ 15 (listing all ASINs of the Accused Product).  PowX has been selling its foam rollers, including the Accused Product, on Amazon since December 2022.

### B.  The Asserted Patents

The five Asserted Patents held by Performance Solutions all concern a "therapeutic, fitness, and sports enhancement device" with "projections" "configured to extend into soft tissue of a user."

Claim 1 of each Asserted Patent are as follows, with emphasis added by the Court:

| | |
|---|---|
| **The '921 Patent** (*See* Puri Decl. Ex. A.) | A **one piece** therapeutic, fitness, and sports enhancement device comprising: a one piece **completely cylindrically shaped body** comprised entirely of **foam or plastic** and including a **plurality of solid projections** having a predetermined shape **configured to extend into soft tissue** of a user to enhance mobilization of soft tissue and optimize body core strength and balance training. |
| **The '167 Patent** (*See* Puri Decl. Ex. B.) | A **two piece** therapeutic, fitness, and sports enhancement device consisting of: a first piece including an **entirely cylindrically shaped core made of closed cell foam, plastic, or rubber material** and having a diameter of about 3 inches to about 15 inches; and a second piece including an overlay about the cylindrically shaped core, the **overlay made of closed cell foam, plastic, or rubber material**, including a **plurality of shaped projections extending from the overlay**, each of the plurality of shaped projections **configured to extend into soft tissue** of a user to enhance mobilization of soft tissue and optimize body core strength and balance training. |

| The '112 Patent (*See* Puri Decl. Ex. C.) | A **two piece** therapeutic, fitness, and sports enhancement device comprising: a first piece including an **entirely cylindrically shaped core made of closed cell foam, rubber or plastic** and having a diameter of about 3 inches to about 15 inches and; a second piece including an overlay completely surrounding the core, the **overlay made of closed cell foam, rubber, or plastic** and including a plurality of **solid projections** having a predetermined shape **configured to extend into soft tissue** of a user to enhance mobilization of soft tissue and optimize body core strength and balance training. |
|---|---|
| The '890 Patent (*See* Puri Decl. Ex. D.) | A **free standing** therapeutic, fitness, and sports enhancement device comprising: a free standing **entirely cylindrical shaped core** having a first end and a second end, **made of closed cell foam, rubber, or plastic** and having a diameter of about 3 inches to about 15 inches; and an **overlay completely surrounding the core** from about the first end to about the second end, **the overlay made of closed cell foam, rubber, or plastic and including a plurality of solid projections** having a predetermined shape **configured to extend into soft tissue** of a user to enhance mobilization of soft tissue and optimize core strength and balance training. |
| The '260 Patent (*See* Puri Decl. Ex. E.) | A **stand-alone** therapeutic, fitness, and sports enhancement device comprising: **a cylindrically shaped core** having a first end and a second end and having a longitudinal axis made of **closed cell, foam, rubber, or plastic** and having a diameter of about 3 inches to about 15 inches; and an **overlay completely circumferentially surrounding the core** from about the first end to about the second end, the **overlay made of closed cell foam, rubber, or plastic** and including a plurality of **solid projections** having a predetermined shape **configured to extend into soft tissue** of a user. |

As is evident from the above chart, the Asserted Patents' claims share many similarities. Each Asserted Patent's Claim 1 begins with a preamble (*e.g.*, Preamble to the '890 Patent: "A free standing therapeutic, fitness, and sports enhancement device comprising:"; Preamble to the '112 Patent: "A two piece therapeutic, fitness, and sports enhancement device comprising:"). Following the preamble, most then proceed with two sub-claim elements (*e.g.*, Claim Element 1(a) of the '260 Patent: "a cylindrically shaped core having a first end and a second end and having a longitudinal axis made of closed cell, foam, rubber, or plastic and having a diameter of about 3 inches to about 15 inches;"; Claim Element 1(b) of the '890 Patent: "and an overlay completely surrounding the core from about the first end to about the second end, the overlay made of closed cell foam, rubber, or plastic and including a plurality of solid projections having

4

a predetermined shape configured to extend into soft tissue of a user to enhance mobilization of soft tissue and optimize core strength and balance training.").  The '921 Patent, which is the only Asserted Patent explicitly comprised of only "one piece," accordingly contains only one sub-claim element after its preamble ("a one piece completely cylindrically shaped body comprised entirely of foam or plastic and including a plurality of solid projections having a predetermined shape configured to extend into soft tissue of a user to enhance mobilization of soft tissue and optimize body core strength and balance training.").  Furthermore, all the Asserted Patents share the same specification, *i.e.*, the accompanying document that contains the description, illustrations, and scope of the patent, except the '167 Patent which omits and revises certain figures and portions of description in its specification.

### C.  The Amazon Foam Roller Market

Foam rollers have been widely used in the United States to reduce pain, aid in mobility, and assist in self-massage since the 1980s.  The foam roller that may be most familiar to an average consumer is likely smooth, dense, and typically made from a Styrofoam-like material.  There are also foam rollers on that market that have textured exteriors, which can include ridges, spikes, bumps, or projections.  Typically, textured foam rollers are more expensive than the standard "smooth" models.  Broadly and generally speaking, one uses a foam roller by placing the targeted body part on top of or under the foam roller and then employing body weight or body motion, in combination with the roller itself, to massage, stretch, or otherwise manipulate the targeted body part.  Foam roller use has been shown to aid healing of injuries, assist in muscle recovery from exercise, and assist with circulation.

As with many other products of all kinds available online, a substantial portion of foam roller sales now occur through Amazon.  Both individual consumers and businesses such as

gyms and physical therapist clinics (who tend to purchase more than one such item) make their purchases on Amazon.  May 22, 2024 Tr. 12:22–13:19.  When an Amazon customer interested in purchasing a foam roller conducts a search for the desired product, the customer will typically be shown a sampling of foam roller products to evaluate and potentially purchase.  Among the factors that determine which products are shown to the customer on the first page of search results is where that product falls on Amazon's "Best Seller Rankings," or the "BSR."[2]  *See* Lewis Decl. ¶¶ 12, 20; May 22, 2024 Tr. 48:2–49:20; *see also* Daisy Quaker, Guide to Amazon Best Sellers and Sales Rank, Amazon (Apr. 14, 2023), https://sell.amazon.com/blog/amazon-best-sellers-rank.  BSR is purely a reflection of a product's sales volumes—it does not factor in customer reviews or ratings or page view data.  A product's BSR depends on the market (or "category") the product falls into and how its sales compare to other products in that category.  For example, according to Amazon, "a kitchen scale might rank #14 in Kitchen & Dining, and rank #2 in the Digital Kitchen Scales subcategory. The same item might only rank #2056 (or not rank at all) in the Health & Household category."  Quaker, Guide to Amazon Best Sellers and Sales Rank.

Within the Amazon sub-market for foam rollers, the Accused Product, TriggerPoint Rollers, and 321 Strong Rollers are all represented on the BSR.  At the time of the parties' briefing on the PI Motion, 321 Strong Roller licensed products ranked as second, fifteenth, twenty-first, and twenty-fourth on Amazon's BSR in the "Foam Roller" category; TriggerPoint Roller licensed products ranked as fifth, twenty-third and twenty-fifth; and PowX's Accused

---

[2] The evidence presented by Performance Solutions in the Declaration of Justin V. Lewis relating both to Amazon's BSR generally and specifically the BSR rankings of PowX, TriggerPoint Rollers, and 321 Strong Rollers within the Amazon foam roller market appears to be undisputed between the parties.  On opposition, PowX did not submit a responsive expert report or declaration regarding the financial and economic issues pertinent to the PI Motion, or otherwise provide evidence disputing the veracity of the data collected by Mr. Lewis.

Product was listed as tenth and thirteenth.  In short, within the Foam Roller category, PowX's Accused Product was outselling all but two of the Licensee Products.

The Accused Product is also significantly less expensive than the Licensee Products. Specifically, the Accused Product is 18–28% cheaper than the 321 Strong Rollers, and 34–68% cheaper than TriggerPoint Rollers.  *See* Lewis Decl. ¶ 15 (Table 3).  In many cases the Accused Product's prices are closer to the non-textured "smooth" rollers than they are to other comparable textured rollers.  *See id.* ¶¶ 16, 48; *see also* May 22, 2024 Tr. 13:20–14:2; 15:10–17.  The relative inexpensiveness of the Accused Product has contributed to its market share of approximately 22% of the relevant foam roller market on Amazon.  Lewis Decl. ¶¶ 20 (Table 4), 22.

### D.  The Amazon APEX Program

To allow patent holders to report and seek the removal of infringing products from the Amazon marketplace, Amazon has implemented a program called the Amazon Patent Evaluation Express, or "APEX," which is an online process that Amazon developed around 2022 for reporting infringing ASINs.  The APEX program allows a patent holder to submit a complaint that identifies an allegedly infringing ASIN and provides legal argument and information in support of the infringement claim.  A patent owner can only assert one patent in an APEX complaint against a seller, *i.e.*, a patent owner cannot say that an ASIN violates more than one of its patents at a time.  Once a complaint is filed through APEX with respect to a particular ASIN, Amazon provides the seller of that ASIN approximately twenty-one days to either participate in Amazon's patent evaluation process with a third-party neutral arbiter or to resolve its claims directly with the patent owner.

If the reported seller chooses to participate in the APEX process, it is provided with the opportunity to submit a response to the claims of infringement.  *See, e.g.*, Dye Decl. Ex. A (PowX's response to Performance Solutions' claims of infringement made through APEX).  Within two weeks of the last response in the evaluation process, the neutral evaluator provides a decision to Amazon recommending either removing the infringing product from Amazon or, if the evaluator finds that the product is unlikely to actually be infringing, allowing the product to remain for sale.  Amazon will usually promptly act (or refrain from acting) according to the evaluator's recommendation.

If, however, either party in an APEX complaint chooses instead to litigate the claims of patent infringement in court, Amazon usually pauses any APEX-related procedures in deference to the pending litigation.  *See* Dye Decl. Ex. E ("We have been notified by the seller . . . that they have filed a declaratory judgement regarding patent 9,656,112.  As a result of this filing, we will be pausing [the evaluation] and deferring to the court's decision in this matter."); Ex. F ("Where a seller chooses to avail itself of the due process protections of court to litigate a claim of patent infringement, we will usually defer to that choice[.]").

### E.  Timeline of the Present Dispute

Performance Solutions has been reporting infringing foam rollers to Amazon and requesting that Amazon remove those products from its website since November 2018,[3] and was successful in removing thousands.  That changed in November 2020, however, when another seller of textured foam roller products—Ron Johnson Engineering, Inc.[4]— filed *ex parte*

---

[3] Prior to the implementation of the APEX program in 2022, complaints regarding patent infringement went directly to Amazon's IP legal team.

[4] Performance Solutions is currently engaged in separate litigation proceedings with Ron Johnson Engineering Inc. involving the Asserted Patents.  *See* May 2, 2024 Tr. 15:3–10; *see also Performance Solutions, LLC v. Ron Johnson Engineering, Inc.*, 20-cv-00498 (DKW) (RT) (D. Haw.).

reexamination petitions with the United States Patent and Trademark Office (the "USPTO") against four of the Asserted Patents: the '167, '112, '890 and '260 Patents.

In response to the reexamination of these patents and the resulting adverse final examiner's office action, in late 2021 Amazon notified Performance Solutions that it would reinstate certain foam roller products it had previously removed as infringing. From December 2021 until August 23, 2022—when Performance Solutions appealed the examiner's action to the USPTO's Patent Trial and Appeal Board (the "PTAB")—Amazon allowed products that Performance Solutions believed infringed upon the '167, '112, '890 and '260 Patents to continue to be sold. Even after the PTAB appeal had been initiated and the finality of the examiners' decision had been retracted pending appeal, Amazon allowed many of the allegedly infringing products to be sold because the reexamination process was still ongoing.

In December 2022, during this period of limbo for the '167, '112, '890 and '260 Patents, PowX began to sell its textured foam rollers on Amazon. In March 2023, Performance Solutions filed a complaint in the APEX program requesting that Amazon remove PowX's Accused Product for infringement of the '112 Patent. On March 22, 2023, PowX provided a response to Amazon (not shared with Performance Solutions at the time) that claimed Performance Solutions' complaint was "baseless." *See* Dye Decl. Ex. A. PowX's main non-infringement argument to Amazon in the March 22, 2023 letter was that the Accused Product does not "feature a core," as required by the '112 Patent, but instead "has a hollow inner cavity." *Id*. at 2. PowX, while expressly reserving all rights, did not make any other non-infringement arguments to Amazon, and did not raise any arguments regarding the invalidity of the '112 Patent. *See id*. Amazon ultimately refused to remove the Accused Product due to the pending reexaminations.

On December 6, 2023, the PTAB reversed the examiner's findings as to all 107 claims in the four patents under reexamination and Notice to Issue Reexamine Certificates were issued with respect to each.[5]  Given the sweeping reversal, on January 29, 2024, Performance Solutions renewed its APEX complaint against the Accused Product for infringement of the '112 Patent.

On February 21, 2024, PowX contacted Performance Solutions expressing an interest in coming to a royalty or licensing agreement so that PowX could continue to sell the Accused Product.  *See* Dye Decl. Ex. B (email from owner of PowX, Israel Laufer ("Mr. Laufer"), to Performance Solutions' founder, Mr. Dye).  Mr. Dye responded the next day seeking further information about the Accused Product and providing additional information about the Asserted Patents.  *See* Dye Decl. Ex. C.

On February 23, 2024, unbeknownst to Performance Solutions, PowX initiated this action.  *See* Dkt. No. 1.  On February 24, 2024, Mr. Dye again emailed Mr. Laufer—having not heard back regarding his previous correspondence and still unaware of the existence of this lawsuit—providing one of the recent, favorable PTAB decisions in order to help Mr. Laufer "evaluate the substance of our notifications to Amazon."  *See* Dye Decl. Ex. D.

Days later, Amazon informed Performance Solutions that it was pausing the pending APEX evaluation regarding the Accused Product due to a declaratory judgment action filed by PowX against Performance Solutions.  *See* Dye Decl. Exs. E, F.  As of the date of this Opinion and Order, the Accused Product remains available for purchase on Amazon.

## II.    PROCEDURAL HISTORY

PowX filed its original complaint on February 23, 2024.  PowX never filed proof of service as to this original complaint, and amended twice—first, on the same day the original

---

[5] As of the time of the parties' briefing, the USPTO had already issued Reexamination Certificates for the '167, '890 and '260 Patents, and a Notice of Intent to Issue a Reexamination Certificate for the '112 Patent.

complaint was filed (*see* Dkt. No. 3), and second, on April 3, 2024 (*see* Dkt. No. 9, the

"Complaint," or "Cplt.").  One week later, on April 10, 2024, Performance Solutions appeared,

filing an Answer and Counterclaims (*see* Dkt. No. 14, the "Counterclaims"), and its Motion for

Preliminary Injunction and supporting brief.  In support of its PI Motion, Performance Solutions

included declarations from five witnesses: (1) Kipp K. Dye, inventor of the Asserted Patents and

the founder and manager of Performance Solutions (*see* Dkt. No. 16-1); (2) Dr. Ryan Abbott,

Performance Solutions' expert on the issues of infringement and validity, relying on his expertise

in both medicine and law (*see* Dkt. No. 16-2); (3) Lawrence G. Copley, Performance Solutions'

expert on cylinders (*see* Dkt. No. 16-3); (4) Justin V. Lewis, Performance Solutions' expert on

financial and economic issues (*see* Dkt. No. 16-4); and (5) Dr. Christopher Scott, Performance

Solutions' material science, engineering, and polymer expert (*see* Dkt. No. 16-5); as well as a

declaration from Performance Solutions' attorney, Ashe P. Puri (*see* Dkt. No. 16-6).

On April 25, 2024, PowX filed its Opposition to the PI Motion (*see* Dkt. No. 20, the

"Opposition," or "Opp.") with supporting declarations from Abe Kopolovich, PowX's

infringement expert (*see* Dkt. No. 21), and PowX's attorney, Sandra A. Hudak (*see* Dkt. No. 22).

On April 30, 2024, Performance Solutions filed its Reply in support of the PI Motion (*see*

Dkt. No. 24, the "Reply"), attaching two supplemental supporting declarations from Dr. Scott

and Mr. Dye (*see* Dkt. Nos. 24-1, 24-2).

The Court scheduled a hearing and oral argument on the PI Motion for May 2, 2024.

Leading up to the hearing, the parties submitted a joint letter setting forth their respective

positions on a proposal for the hearing's format.  *See* Dkt. No. 23 ("April 30 Letter").  In

response to the parties' conflicting positions as to the necessity of live witness testimony

presented in the April 30 Letter and restated by counsel at the beginning of the May 2 hearing,

the Court heard oral argument from counsel for both parties at the May 2 hearing, and scheduled

a continuation of the hearing to be held on May 22, 2024 and May 23, 2024, to provide a full

opportunity for party witnesses to testify and be cross-examined.  Both parties affirmed that any

witness they wished to call or to cross-examine would be available on one of those two days.  On

May 16, 2024, the parties filed a joint letter again outlining their disputes as to the nature and

format of the anticipated witness testimony.  *See* Dkt. No. 27.  The Court issued an Order on

May 21, 2024, clarifying its expectations as to the manner of the testimony and informing the

parties that the May 23, 2024 portion of the hearing may be cancelled given the parties' apparent

agreement that the live testimony of PowX's expert, Mr. Kopolovich, was no longer sought by

either party.  *See* Dkt. No. 32.  Finally, at the May 22, 2024 continuation of the hearing, four of

Performance Solutions' witnesses gave live testimony: Mr. Lewis, Mr. Dye, Dr. Scott, and Dr.

Abbott.  Counsel for PowX cross-examined each witness.  All testimony concluded on May 22

and accordingly the previously-scheduled hearing date of May 23 was cancelled.

## DISCUSSION

On substantive questions of patent law, this Court is bound by the precedents of the U.S.

Court of Appeals for the Federal Circuit.  *See Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446,

1451 n.12 (Fed. Cir. 1988).  Pursuant to 35 U.S.C. § 283, district courts may grant injunctive

relief to a patent holder in order to "prevent the violation of any right secured by patent," and the

decision whether to do so is within the district court's sound discretion.  *Novo Nordisk of North*

*Am., Inc. v. Genentech, Inc.*, 77 F.3d 1364, 1367 (Fed. Cir. 1996).  Performance Solutions is

entitled to a preliminary injunction if it shows: "(1) a reasonable likelihood of success on the

merits; (2) irreparable harm if an injunction is not granted; (3) a balance of hardships tipping in

its favor; and (4) the injunction's favorable impact on the public interest."  *Amazon.com, Inc. v.*

*Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (citing *Reebok Int'l Ltd. v. J.*

*Baker, Inc.*, 32 F.3d 1552, 1555 (Fed. Cir. 1994)).  Alone each factor is not dispositive; rather, in reaching its decision, the district court must weigh each factor against the others and in combination.  *Id.*

 After analyzing each factor in light of the evidence presented during the hearing and submitted in connection with the briefing on the PI Motion, and as more fully set forth below, the Court finds that each factor, both alone and in combination, tilts in favor of Performance Solutions and the granting of the preliminary injunction it seeks.

## I. LIKELIHOOD OF SUCCESS ON THE MERITS

 Patents are accorded an initial presumption of validity and enforceability pursuant to 35 U.S.C. § 282.  *See New England Braiding Co., Inc. v. A.W. Chesterton Co.*, 970 F.2d 878, 882 (Fed. Cir. 1992) (citation omitted).  Accordingly, while Performance Solutions continues to bear the burden of establishing each factor for preliminary injunction, the initial burden is on PowX to produce evidence raising a "'substantial question' concerning validity, enforceability, or infringement."  *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997) (citation omitted).  If "substantial question" evidence is presented on validity or enforcement, Performance Solutions then may be required to produce countervailing evidence demonstrating that these defenses lack substantial merit.  *Id.*  In a case involving multiple patents, Performance Solutions need not demonstrate a likelihood of success on the merits with respect to *each* Asserted Patent; it must only demonstrate that it "will likely prove infringement of *one or more claims* of the [Asserted Patents], and that *at least one* of those same allegedly infringed claims will also likely withstand the validity challenges" presented by PowX.  *Amazon.com, Inc.*, 239 F.3d at 1351 (emphasis added).

PowX has raised both non-infringement and invalidity in opposition to Performance Solutions' PI Motion.  But in so doing, PowX has failed to produce evidence that raises a "substantial question" concerning either the Asserted Patents' enforceability or validity, or that meaningfully undermines Performance Solutions' evidence of infringement.  Even assuming *arguendo* that PowX's positions were supported by evidence that satisfied the "substantial question" standard, in each instance, Performance Solutions offered rebuttal evidence sufficient to show PowX's defenses lack substantial merit.  Finally, even if the burden rested entirely with Performance Solutions to prove its infringement claims, it has done so with evidence sufficient to prevail at the preliminary injunction stage.  On the record before the Court, therefore, the Court finds that Performance Solutions is likely to succeed on its claims.

### A.  Infringement

At the preliminary injunction stage, "[a]n assessment of the likelihood of infringement, like a determination of patent infringement at a later stage in litigation, requires a two-step analysis. 'First, the court determines the scope and meaning of the patent claims asserted . . . [Secondly,] the properly construed claims are compared to the allegedly infringing device.'" *Oakley, Inc. v. Sunglass Hut Intern.*, 316 F.3d 1331, 1339 (Fed. Cir. 2003) (citing *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998)).

PowX raises four main non-infringement arguments: (1) the Accused Product does not include a "core" or "body" as required by the Asserted Patents; (2) the Accused Product does not include "solid projections" or "projections extending from the overlay" as required by the Asserted Patents; (3) Performance Solutions has not offered evidence that the Accused Product's "projections" are "configured to extend into soft tissue," as required by the Asserted Patents; and

(4) the Accused Product cannot both be a "one piece," (as required by the '921 Patent) and a "two piece" device (as required by the '167 and '112 Patents).

At this preliminary injunction stage, because the Court is not required to conduct a full and final claim construction analysis, issues of claim construction or non-infringement are addressed only where the dispute between the parties is readily apparent.  *See Shuffle Master, Inc. v. VendingData Corp.*, 163 F. App'x 864, 867–68 (Fed. Cir. 2005) ("[A] district court does not have to conduct a comprehensive and final claim construction in a preliminary injunction proceeding.  Similarly, it is not necessary for a court to conduct an explicit claim construction if the claim construction issue is a simple one that needs no analysis, or in which there is no reasonable ground for dispute as to claim meaning.") (internal citation omitted).  Because PowX does not clarify—and the Court is unable to independently discern—where its legal arguments regarding claim meaning end and its factual non-infringement arguments begin (and vice versa), any disputes as to both the meaning of the claim elements and the Accused Product's infringement thereof are addressed concurrently.  Upon consideration of the evidence in the record before the Court, the Court finds that the Accused Product is likely to infringe on *at least* one, and up to four, of the five Asserted Patents.

### 1.   The Asserted Patent Claim Elements of a "Cylindrically Shaped Core," or a "Cylindrically Shaped Body"

All the Asserted Patents require either a "cylindrically shaped core," (*see* the '167, '112, '890, '260 Patents) or a "cylindrically shaped body," (*see* the '921 Patent).[6]  As its first line of

---

[6]  The Asserted Patents all additionally require that the "core" or "body" be "made of closed cell foam, rubber or plastic" (*see* the '112, '890, '260 Patents), "foam or plastic" (*see* the '921 Patent), or a "closed cell foam, plastic, or rubber material" (*see* the '167 Patent.  Performance Solutions put forth evidence in its opening briefing that the Accused Product infringes this claim element in all the Asserted Patents because it is made of "plastic."  *See* Mot. at 12; Scott Decl. ¶ 15.  On opposition, PowX does not dispute that the Accused Product's core or body is made of plastic.  The Court therefore does not address this claim element further and considers it satisfied.

defense against Performance Solutions' claims of infringement, PowX argues that the Accused Product does not embody this claim element because the Asserted Patents require the "body"/"core" to be "solid" and "pliable" and the Accused Product, having a "hollow inner cavity," cannot be considered to have such a body or core. *See* Opp. at 12–14.

This argument is unavailing for several reasons. First, the terms "substantially solid," "solid" or "pliable" appear nowhere in any of the claims of the Asserted Patents as modifiers on the "body" or "core" claim elements.[7] While the term "pliable" appears in some of the Asserted Patents' specifications, (*see e.g.*, Puri Decl. Ex. A, the '921 Patent, at 5 ("Body 12 with projections 14 is preferably made of a pliable material")), courts do not import terms from the specification but rather interpret the claim terms by their plain, ordinary, and accustomed meanings. *Generation II Orthotics Inc. v. Medical Tech. Inc.*, 263 F.3d 1356, 1367 (Fed. Cir. 2001). The plain, ordinary understanding of the terms of the claim elements "completely cylindrically shaped body," and "entirely cylindrically shaped core," do not necessitate that such a body or core be either substantially solid or pliable. Indeed, those claim terms are silent as to the relative firmness or flexibility of such a body or core.

Second, even if the terms "solid" and "pliable" were to be properly considered in this analysis, the Court disagrees with PowX that the use of the terms "solid" or "pliable" to describe the "body" or "core" necessarily implies that the "body" or "core" cannot be hollow. *See* Opp. at 13 ("[T]he Asserted Patents' use of a 'pliable' material for the body/core conveys that the body/core will be solid, as a hollow tube of foam would not support much bodyweight before collapsing."). Naturally, there are varying degrees of solidity and pliability. One can easily

---

[7] The term "solid" appears in numerous places in the claims of the Asserted Patents, but only to describe the *projections*, not the "body" or "core."

imagine a structurally solid, yet pliable, plastic that is both flexible enough to yield under the weight of a user to aid in massage, but not so pliable that, if hollow, it would entirely collapse.

Finally, several of the Asserted Patents' claims specifically anticipate some degree of hollowness of the core. For example, claim 24 of the '921 Patent states "[t]he device of claim 1 further including a *lumen* extending through the body." *See* Puri Decl. Ex. A at 11 (emphasis added); *see also* Puri Decl. Ex. C, the '112 Patent, at 11 (claim 14 stating: "[t]he device of claim 1 further including a lumen extending through the body."). Literally, the term "lumen" means "the cavity of a tubular organ or part," or "the bore of a tube (as of a hollow needle or catheter)." *See Lumen*, Merriam Webster.com Dictionary, https://www.merriam-webster.com/dictionary/lumen (last visited June 6, 2024). "Hollow" and "cavity" are the exact terms PowX used to defend the Accused Product from claims of infringement on the '112 Patent in the APEX proceedings before Amazon (*see* Dye Decl. Ex. A at 2), and again in these proceedings (*see* Opp. at 13 ("the Accused Product has a ***hollow*** inner cavity[.]") (emphasis in original))).

Accordingly, PowX has not raised a substantial question as to the Accused Product's infringement on this claim element, present in all five of the Asserted Patents, and Performance Solutions is likely to succeed on its infringement claims as to this claim element.

## 2. The Asserted Patent Claim Elements of "Solid Projections" or "Projections Extending from the Overlay"

The '112, '890, '260, and '921 Patents all include a claim element requiring "solid projections." (The '167 Patent is alone in the Asserted Patents as only requiring "shaped projections extending from the overlay," without reference to the projections being solid.) Again, Performance Solutions has adequately demonstrated that the Accused Product infringes this claim element and PowX has failed to raise a substantial question as to the Accused

Product's infringement of this claim element.  Performance Solutions is thus likely to succeed on
its claims with respect to this claim element, as well.

On opposition, PowX did not offer factual or expert witness testimony or analysis
regarding the solidity, or lack thereof, of the ridged projections on the exterior of the Accused
Product.[8]  In its memorandum of law, however, PowX did submit a photograph and diagrams
showing the Accused Product's "overlay" and highlighting the "hollow portions underneath"
each bump.  *See* Opp. at 15.  PowX claims that the presence of these "hollow portions" within
the overlay mean that the projections cannot be "solid."  *See id*.  Furthermore, PowX argues that
because the hollow portions are "***between*** the rigid tube and the cover," the projections cannot
"'extend[]' from an 'overlay.'"  *See id*. (emphasis in original).

First, as discussed further above, the claim limitation term "solid" does not necessarily
exclude the term "hollow;" depending on the context, a thing can be both solid and hollow and
still embody the meaning of those terms.  *See supra* § I(A)(1).  Second, on Reply, Performance
Solutions submitted a declaration from Dr. Scott showing detailed analysis and the results of
personal tests performed that show the projections are indeed "solid throughout the interior of
each projection."  *See* Supp. Scott Decl. ¶¶ 13–19, figs. 1–4.  The Court agrees with Dr. Scott's
conclusions, as the testing and analysis proffered as evidence shows that the "holes" or "hollow
portions" in the Accused Product are part of the overlay, not the projections that extend from the
overlay.  *See id*. ¶ 19, fig. 4 (showing a "Close-up of Cross-section" of the Accused Product's
overlay clearly evidencing that the projections extending from the overlay conclude before the
hollow portions underneath begin).  Moreover, Dr. Scott credibly and convincingly explained his

---

[8] As discussed further below, *infra* § I(A)(3), PowX's infringement expert witness addressed only the
"configured to extend into soft tissue" claim limitation, and did not physically review, test, or analyze the Accused
Product.  *See* Kopolovich Opp. Decl. ¶¶ 10-12.

conclusions, and the basis for them, during his live testimony on May 22, 2024.  So, even assuming PowX had raised a substantial question as to the Accused Product's non-infringement on the "solid projections" or "projections extending from the overlay" claim element, Performance Solutions provided ample rebuttal evidence sufficient to show PowX's defense lacks substantial merit.

### 3. The Asserted Patent Claim Elements of Projections "Configured to Extend Into Soft Tissue"

All of the Asserted Patents include a claim element stating that the "projections" of the device be "configured to extend into soft tissue of a user."  Before the PTAB, and in its submissions to the Court in support of the PI Motion, Performance Solutions argued—and the PTAB adopted the position—that to be "'configured to' extend into soft tissue," under the meaning of the Asserted Patents, the projections of the device must have an appropriate "combination of size, density, and shape" and must be "adequately spaced apart to allow for generation of adequate pressure."[9]  *See* Puri Decl. Ex. I at 7–8.  "Soft tissue" was further defined as "muscles, fascia, tendons and ligaments."  *See* Hudak Opp. Decl. Ex. 5 at 4–5 (PTAB Decision on Appeal regarding the '112 Patent adopting the "the proper definition of soft tissue . . . [as] muscles, fascia, tendons and ligaments," because that is what "a person of ordinary skill in the art would have understood the inventor's invention to be[.]").  PowX claims that Performance Solutions has made no showing that the Accused Product meets this definition, and therefore, has not shown that it infringes on this claim element.  *See* Opp. at 16–19.

As a preliminary matter, PowX's phrasing of its defense to infringement as to this claim element is particularly illuminating.  PowX never claims that the Accused Product's projections

---

[9] Performance Solutions conceded at the PI Hearing that it is bound in these proceedings by the arguments it made before the PTAB.  *See* May 2, 2024 Tr. 18:2–9.

are *not* configured to extend into the soft tissue of a user.[10]  Rather, it stops short of that admission, claiming only that Performance Solutions has "[p]roffered [n]o [e]vidence" that the projections are configured to extend into soft tissue of the users of the Accused Product.  *See* Opp. at 16.  Setting aside the burden-shifting requirements of the presumption of validity and enforceability, this assertion is simply incorrect.  Performance Solutions *did* provide evidence— in the form of sworn declarations, expert analysis, and testimony—supporting its assertion that the Accused Product is configured to extend into soft tissue.  *See* Abbott Decl. ¶¶ 21–23.  At the May 22, 2024 hearing, PowX cross-examined Performance Solutions' infringement expert Dr. Abbott extensively on the testing and analysis he conducted in order to reach his determination that the Accused Product was configured to extend into soft tissue.  *See* May 22, 2024 Tr. 97:24– 129:25.  The Court found Dr. Abbott to be highly qualified and his testimony to be credible and convincing.  Again, PowX provided no rebuttal evidence, only argument.[11]

---

[10] Indeed, it would have a difficult time doing so, given the Accused Product's marketing materials are replete with claims that the Accused Product's projections do exactly that.  *See* Puri Decl. Ex. L at 7 ("Dig Deeper – Achieve a superior muscle release thanks to the teardrop ridges on your back foam roller and trigger point massager. This strategic pattern can target knots and tension from any angle.") (emphasis omitted); *Id.* ("Reach deep muscle fibers thanks to strategically placed teardrop ridges.") (emphasis omitted); *see also* May 2, 2024 Tr. 42:19–43:10 ("THE COURT: …[D]oesn't PowX advertise its products as affecting the muscle tissue and intruding into the muscle layer? // MS. HUDAK: So there's two responses to that -- or multiple responses. First, it's Performance Solutions' burden to prove infringement. So relying on our marketing materials doesn't show that the product itself actually does what they want it to or is required by the claims. Another response to that -- // THE COURT: Is your client okay with you saying in open court that [their] marketing material is not true? // MS. HUDAK: So the issue is that Performance Solutions has made this very specific definition of what a deep tissue massage is. So a deep tissue massage is achieved by -- or many companies say that it's achieved by a flat foam roller, a smooth foam roller.").

[11] As part of its papers in opposition to the PI Motion, PowX submitted an expert declaration from Abe Kopolovich in which Mr. Kopolovich opined on whether the Accused Product was "configured to extend into soft tissue," ultimately concluding that it was not.  *See* Kopolovich Opp. Decl. ¶ 68 ("[I]t is my opinion that the Accused Product does not satisfy the 'configured to extend into soft tissue' limitations of the independent claims of the Asserted Patents, and thus is not infringing.").  However, Mr. Kopolovich did not physically examine the Accused Product or perform tests on it; he only reviewed photographs and the dimensions and descriptions of the Accused Product provided on its Amazon webpage.  *See id.* ¶¶ 10–12 (listing "Data and Other Information" considered in support of the opinion).  Thus, his opinion with respect to the "configured to extend into soft tissue," claim element appears to be entirely based on comparing the prior art analyzed in the PTAB proceedings to the photographs of the Accused Product.  *See generally id.*  Despite ample opportunity to do so, PowX elected not to call Mr. Kopolovich for live testimony regarding his opinions.  Based on the declaration, the Court finds Mr. Kopolovich's conclusions both unpersuasive and inadequately founded.

In support of its argument, PowX points to three prior art examples that Performance Solutions argued before the PTAB were *not* configured to extend into soft tissue—the "Iyomasa" (*see* Hudak Opp. Decl. Ex. 9), the "Wang" (*see id*. Exs. 7, 8), and the "Wisnieski" (*see id*. Ex. 10) (together, the "Prior Arts")—to show that the Accused Product also cannot "extend into soft tissue."[12]  *See* Opp. at 16–19; *see also id*. at 19 ("In view of this history and PS's definition of the 'extend into soft tissue' element, it is simply not plausible that the Accused Product could meet this limitation, which is required by ***all*** of the Asserted Patents.") (emphasis in original). While images of these patents may, at first glance, appear similar to the Accused Product, *see id.*, the images are not relevant to the Court's analysis of whether the Accused Product infringes on the Asserted Patents.  *See Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 527 (S.D.N.Y. 2002), *aff'd sub nom*., *In re Omeprazole Pat. Litig.*, 84 F. App'x 76 (Fed. Cir. 2003) ("A claim is literally infringed if the elements of the asserted claim are present in the allegedly infringing product, process or method of use. The Federal Circuit has 'made unequivocally clear ... that there is no "practicing the prior art" defense to literal infringement.'") (citing *Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*, 279 F.3d 1357, 1365 (Fed. Cir. 2002) (internal citation omitted)).[13]

---

[12] In its briefing, PowX also claims that Performance Solutions' admitted before the PTAB that a related textured foam roller device, the "Gator Roller," does not extend into soft tissue as required by the claims.  *See* Opp. at 19 (claiming that Performance Solutions' counsel provided the Gator Roller as a "good example" of a roller that does not extend into soft tissue,' and stating that "[i]f the protrusions of the 'Gator Roller' do not 'extend into soft tissue,' then neither can the Accused Product's[.]").  This is misleading, as Performance Solutions has repeatedly claimed that the Gator Roller *is* an infringing product, and is in fact *currently in active litigation* in which it accuses the Gator Roller of infringement of the four patents subject to the reexamination.  *See* Supp. Dye Decl. ¶¶ 11–12. The Court, therefore, finds this argument meritless and declines to address it further.

[13] To the extent that prior art may be relevant to PowX's invalidity claim, the Court finds, as discussed throughout, that PowX has not raised a substantial question that can overcome the presumption of validity at the preliminary injunction stage.

Furthermore, the USPTO PTAB considered the Iyomasa, Wang, and Wisnieski patents specifically with respect to their relevance as to the "configured to extend into soft tissue" claim element and ruled in favor of Performance Solutions.  *See* Hudak Opp. Decl. Ex. 5 at 9–14.  The Court agrees with the PTAB's reasoning and, with due consideration of their expertise in these matters, adopts it here.  *See American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984) (when a challenger attacks a patent on the basis of prior art that was considered by the PTAB, the challenger "has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job," especially since the patent examiners "are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art").  Performance Solutions has presented convincing evidence that the Accused Product infringes this claim element and PowX has failed to raise a substantial question on non-infringement (or validity) of the claim element.  Accordingly, the Court finds that Performance Solutions is indeed likely to succeed on proving infringement as to this claim.

### 4.   The "One Piece" vs. "Two Piece" Distinction in the Asserted Patents

Lastly, PowX asserts a non-infringement defense on the grounds that the Accused Product cannot both be "a 'one piece' and a 'two piece' device."  *See* Opp. at 19–20.  This argument stems from the observation that two of the Asserted Patents' preambles state that the invention is a "two piece" device (the '167 and '112 Patents), others state it is "free standing" (the '890 Patent) or "stand-alone" (the '260 Patent), and one states it is "one piece," (the '921 Patent).  This point is well-taken, as it stretches logic to imagine a patented device that could at once be both "one piece" *and* "two piece."  PowX is thus correct that its Accused Product cannot both infringe the '921 Patent and the '167 or '112 Patents, as these patents require numerically distinct "pieces" comprising the device.

22

The Accused Product can, however, infringe *either* the '921 Patent *or* the '167 or '112 Patents. It is also logically consistent that the Accused Product infringes *either* the '921 Patents *or* the '167 and '112 Patents *and also* infringes on either the '890 or '260 Patent (or both), as the '890 and '260 Patents do not specify a number of "pieces" that comprise the device, only that the invention is "free standing" or "standalone," which are elements that could be consistent with either a one piece or two piece device.

Thus, if the Accused Product is a "two piece" device, as the Court tends to find based on the images and analysis provided by Performance Solutions (*see* Copley Decl. ¶ 12), that claim element is infringed at a minimum in the '890 and '260 Patents, and at most all four of the '890, '260, '167 and '112 Patents. If the Accused Product is instead a "one piece" device, as PowX previously implied in its letter to Amazon in defense of the APEX proceedings (*see* Dye Decl. Ex. A ("[T]he '112 Patent requires 'a first piece ***including an entirely cylindrically shaped core***…' and 'a second piece including an overlay completely surrounding the core.'…the PowX product does NOT feature a core, and as such, it ***cannot*** infringe the '112 Patent.") (emphasis in original), that claim element is infringed at a minimum in the '921 Patent and at most in all three of the '921, '167 and '112 Patents. Because to prevail on the PI Motion Performance Solutions need only show it is likely to prove infringement of *one or more claims* of the Asserted Patents, and that *at least one* of those same allegedly infringed claims will also likely withstand the validity challenges presented by PowX, this argument does nothing to diminish Performance Solutions' likelihood of success on the merits of their infringement claim.

### B.  Validity

Patents are presumed valid and enforceable, and the burden of establishing invalidity of a patent rests on the party asserting such invalidity. 35 U.S.C. § 282. At trial, to overcome this

presumption "the party challenging a patent must prove facts supporting a determination of invalidity by clear and convincing evidence." *Schumer v. Lab. Computer Sys.*, 308 F.3d 1304, 1315 (Fed. Cir. 2002) (citing *Apotex USA, Inc. v. Merck & Co.*, 254 F.3d 1031, 1036 (Fed. Cir. 2001)).  At the preliminary injunction stage, however, "the trial court does not resolve the validity question but rather must, . . . make an assessment of the persuasiveness of the challenger's evidence, recognizing that it is doing so without all evidence that may come out at trial." *New England Braiding Co.*, 970 F.2d at 883.

On opposition, PowX has attacked the validity of the Asserted Patents for obviousness and indefiniteness. 35 U.S.C. §§ 103(a), 112.  The evidence offered in support of these invalidity challenges, however, is insufficiently persuasive to prevail at this preliminary injunction stage.  On the present record, the Court finds that Performance Solutions is likely to succeed on its claims of the validity of the Asserted Patents.

### 1.  Anticipation and Obviousness

An invention may receive a patent only if it is "novel" in relation to the "prior art" available to the public at the time the patent application is filed.  *See* 35 U.S.C. § 102(b).  A prior art reference renders a patented invention anticipated—and thus invalid—if it discloses "every feature of the claimed invention, either explicitly or inherently." *Hazani v. U.S. Int'l Trade Comm'n*, 126 F.3d 1473, 1477 (Fed. Cir. 1997); *see also Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1379 (Fed. Cir. 2003) ("[A] prior art reference which expressly or inherently contains each and every limitation of the claimed subject matter anticipates and invalidates.") (citations omitted).  To disclose the features of the claimed invention, the prior art must "describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed.Cir.2000); *see also*

24

*MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999).  The disclosure must therefore be "an enabling disclosure," rather than merely "vague intimations of general ideas that may or may not be workable."  *Genentech, Inc.*, 108 F.3d at 1366 (citing *Brenner v. Manson*, 383 U.S. 519, 536 (1966)).  The burden of showing invalidity for anticipation is "especially difficult" when "the infringer attempts to rely on prior art that was before the patent examiner during prosecution."  *Sanofi-Synthelabo v. Apotex Inc.*, 488 F. Supp. 2d 317, 330 (S.D.N.Y. 2006), *aff'd*, 470 F.3d 1368 (Fed. Cir. 2006).

Although the Complaint generally seeks a "Declaratory Judgment of Patent Invalidity," as to the '112 Patent, *see* Cplt. ¶¶ 36-40, PowX did not elaborate on its invalidity arguments with respect to the Asserted Patents until its opposition to the PI Motion.  *See* Opp. at 20–23.  Its arguments for anticipation and obviousness asserted under 35 U.S.C. §§ 102 and 103 primarily rely on 13 prior art examples that it claims are so obvious that "[o]ne of ordinary skill in the art could fill in any gaps for additional limitations required by the dependent claims."  Opp. at 23.  This argument fails for several reasons.

First, none of the prior art cited by PowX "describe[s] every element of the claimed invention, either expressly or inherently[.]"  *Advanced Display Sys.*, 212 F.3d at 1282.  For example, AU654492B2 to Teyssier (cited by PowX in Opp. at 3) has no projections, and a number of PowX's other examples—*e.g.*, WO2004058132A1 to Elias, U.S. Provisional Appl. 60/838,755 to Hitzmann, U.S. Des. Pat. No. D256,841 to Corbett, and U.S. Pat. No. 6,129,687 to Powell—fail to disclose the diameter of the respective inventions' core.  These are of course, just examples, and the Court, having reviewed all the prior art patents, PowX's assertions, and Performance Solutions' defenses thereto, *see* Reply at 6–9, finds that none of them raise a substantial question as to the validity of the Asserted Patents.

25

Second, many of the prior arts raised by PowX were submitted and analyzed by the USPTO PTAB during the reexaminations (*see* Puri Decl. Ex. F) and the PTAB found them insufficient to hold the Asserted Patents invalid.  While the actions of the PTAB are not binding on this Court, the Court gives this significant weight in its analysis because, again, the PTAB has expertise in these matters beyond that of the Court's.  *See Sanofi-Synthelabo Inc.*, 488 F. Supp. 2d at 330, *aff'd*, 470 F.3d 1368 (Fed. Cir. 2006).

## 2.  Indefiniteness

PowX further attacks the validity of the Asserted Patents as "indefinite," as they "do not provide any 'objective boundaries' as to the meaning of" the claim element "configured to extend into soft tissue."[14]  *See* Opp. at 23.  A patent claim satisfies the definiteness requirement of 35 U.S.C. § 112 if a person of ordinary skill in the art would understand the bounds of the claim when read in light of the specification.  In other words, "[a] claim is considered indefinite if it does not reasonably apprise those skilled in the art of its scope."  *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1383–84 (Fed. Cir. 2005).

For the reasons discussed above with respect to PowX's non-infringement arguments as to the "configured to extend into soft tissue" claim limitation, *see supra* § I(A)(3), including the evidence presented by Performance Solutions, the Court finds that this claim reasonably apprises someone skilled in the art that "configured to extend into soft tissue" must be evaluated by considering the material, density, size, and shape of the given product.  *See also* Puri Decl. Ex. I, at 7 (PTAB holding this claim element is "reasonably clear").  Furthermore, at the May 22, 2024

---

[14] PowX also suggests in passing that other terms in the claims may be indefinite, *see* Opp. at 23 ("'*[E]nhance* mobilization of soft tissue' and '*optimize* body core strength and balance training.'") (emphasis in original), but does not provide further context on why these terms in particular should be considered indefinite or to raise a substantial question as to the Asserted Patents' validity.  To the extent this argument was raised by PowX, the Court declines to address it here.

hearing, PowX's counsel thoroughly cross-examined Performance Solutions' expert on infringement and validity issues, Dr. Abbott, as to this specific point. *See* May 22, 2024 Tr. 126:23–129:25. In response to cross-examination implying that the "configured to extend into soft tissue," claim limitation was indefinite due to the fact that whether a device extends into soft tissue may depend on a given users' specific anatomy and physiology, Dr. Abbott testified:

> "[R]egardless of physiology, a *device* would still be configured to extend into soft tissue. There are some areas of soft tissue that some devices might not extend into and that might require a varied dimension —— or characteristic of a projection, but regardless, for example, the [Accused Product] would, in my opinion, extend into soft tissue of a user of any physiology."

*See* May 22, 2024 Tr. 128:2–8 (emphasis added). As noted above, the Court found Dr. Abboth to be highly qualified, and his testimony convincing and credible. The Court agrees with Dr. Abbott here; the pertinent analysis is not whether "extend into soft tissue," is literally true with respect to every person that uses the Accused Product, but whether someone "skilled in the relevant art," would be able to read the claim limitation and determine the invention's scope. *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 899 (2014).

For these reasons, PowX's invalidity arguments lack substantial merit and Performance Solutions is thus likely to succeed in rebuffing PowX's challenges to the Asserted Patents' validity.

## II.    IRREPARABLE HARM

As the "patent statute provides injunctive relief to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable in money," *Reebok*, 32 F.3d at 1556 (citing *Hybritech*, 849 F.2d at 1457), irreparable harm necessitating an injunction has included price erosion, loss of market position, and loss of business opportunities, *see Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1304 (Fed.

Cir. 2013).  Furthermore, the Federal Circuit has consistently held that a party that moves for a preliminary injunction and clearly establishes likelihood of success on the merits "receives the benefit of a presumption on the second" factor, irreparable harm.  *Reebok*, 32 F.3d at 1556; *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1381 (Fed. Cir. 2005).  While the presumption is rebuttable, it shifts the ultimate burden of production onto the infringer.  *See Reebok*, 32 F.3d at 1556 (citing *Rosemount, Inc. v. United States Int'l Trade Comm'n*, 910 F.2d 819, 822 (Fed. Cir. 1990); *Roper Corp. v. Litton Sys., Inc.*, 757 F.2d 1266, 1272 (Fed. Cir. 1985)).

Having shown a likelihood of success on the merits of its claims, Performance Solutions is indeed entitled to such a rebuttable presumption of irreparable harm.  And in the face of Performance Solutions' sworn witness declarations, expert analyses, and live witness testimony in support of its showing of irreparable harm, PowX offered no rebuttal evidence, only attorney argument.  Even without the benefit of the presumption, Performance Solutions has shown it will suffer irreparable harm absent an injunction.[15]

---

[15] PowX devotes a considerable portion of its opposition to the argument that Performance Solutions forfeited its right to a preliminary injunction by waiting "***over a year***" to address this dispute in federal court.  *See* Opp. at 1, 7–8 (emphasis in original); *see also* May 2, 2024 Tr. 45:19–22, 47:10–12 ("Performance Solutions learned of the accused product at least as early 2023. They did not file their motion for a preliminary injunction until more than a year later, April 2024. […] And the delay shows that there was no emergency relief needed here.").  The Court finds this argument unconvincing.  As is evident from the undisputed facts, Performance Solutions did not wait a "year" to enforce its rights.  Rather, during the majority of the year of the alleged delay, the '167, '112, '890 and '260 Patents were under reexamination proceedings by the PTAB.  Within approximately six weeks of the PTAB's December 6, 2024 reversal of the examiner's action, Performance Solutions sought to enforce its patent rights against the Accused Product through the APEX process and was also actively engaging with PowX in discussions it reasonably believed would lead to a potential amicable resolution of their dispute.  *See* Dye Decl. ¶¶ 24–28.  When pressed on this issue at the May 2, 2024 hearing, counsel for PowX conceded that non-litigation efforts to enforce patent rights can be "considered in evaluating irreparable harm."  *See* May 2, 2024 Tr. 48:24–25.  The Court therefore does not begrudge Performance Solutions for not moving for a preliminary injunction sooner, as it was either (1) unable to appropriately enforce its '167, '112, '890 and '260 Patents due to the pending PTAB proceedings, or (2) attempting to enforce its patent rights through non-litigation means.  Once it became clear that enforcement efforts outside of court would be unsuccessful (in part due to PowX's choice to file this litigation), Performance Solutions promptly sought the appropriate relief requested here.

*First*, the Licensee Products are undoubtedly in direct competition with the Accused Product.  All are sold on Amazon, all are on the BSR within the "Foam Roller" category, all compete for the same sales, and all include similar advertising statements and marketing claims.  Put simply, they are all the same category of product (textured foam rollers) available for sale on the same online platform (Amazon): they are quintessential examples of products in direct competition.  *Second*, the Court finds that because the Accused Product is sold for considerably less than any of the Licensee Products, this direct competition between the Licensee Products and the Accused Product will likely lead to imminent price erosion.[16]  While the Court considers Performance Solutions' expert's economic analysis to be helpful in reaching this conclusion, *see* Lewis Decl. ¶¶ 14–17, it is also common sense that if two similar products are being sold in the same market, the more expensive one will eventually feel pressure to lower its prices in order to meaningfully compete, even if the more expensive product is of higher quality.  *Third*, Performance Solutions has put forward evidence that the Accused Product risks causing further loss of market share for Licensee Products.  As discussed, the Accused Product is currently outselling *all but two* of the Licensee Products ASINs.  It also currently holds approximately 22% of the share of the Amazon "Foam Roller" market, as indicated by its margin of sales among the BSR in this category.  *See* Lewis Decl. ¶ 20.  As a product that the Court finds is likely to be infringing on the Asserted Patents every day it is sold, the Accused Product's 22% hold on the relevant market will continue to cause irreparable harm to Performance Solutions, as the Asserted Patents' owner.

---

[16] In fact, it may already have.  At the May 22, 2024 Hearing, Mr. Lewis testified and presented evidence showing that one of the Licensee Products has already lowered its prices in order to compete with the Accused Product.  *See* May 22, 2024 Tr. 22:12–23:14; 45:3–10.

*Finally*, and most persuasively in the Court's view, Performance Solutions has proffered substantial and convincing evidence that absent an injunction, its business opportunities and relationships are likely to be significantly and irreparably damaged.  Particularly crucial to the Court's conclusion on this point was the testimony of Mr. Dye, offered at the May 22, 2024 hearing.  Mr. Dye credibly testified that he takes the responsibility to enforce the Asserted Patents for the benefit of Performance Solutions' valued licensees very seriously, *see* May 22, 2024 Tr. 66:6–11, and that the actions by PowX have already led to lost business opportunities and are affecting both the "good relationship[s]" he has built with the licensees of the Asserted Patents and licensees' ability to make timely royalty payments, *see id*. 65:23–67:6, 73:14–22.

Even prior to the hearing, Performance Solutions offered significant evidence in the record that the Accused Product is irreparably harming its business relationships.  The Licensee Products are forced to run sponsored ads on Amazon to compete with the Accused Product and its lower prices, and the licensing companies are, obviously, unhappy with that additional cost to their businesses.  *See* Dye Decl., ¶ 12; May 22, 2024 Tr. 71:5–73:7.  The continued price erosion caused by the Accused Product's presence in the market also makes it significantly less likely that future companies will be willing to pay Performance Solutions to license the Asserted Patents; indeed, if the Asserted Patents are permitted to be infringed without consequence, why would anyone pay to license them?  As Mr. Dye testified, this unfortunate dynamic has led to the breakdown of more than one discussion with potential licensees.  *See* May 22, 2024 Tr. 66:14–67:6.

Having shown a likelihood of success on the merits, as discussed above, Performance Solutions is legally entitled to the presumption of irreparable harm.  *See Reebok*, 32 F.3d at 1556.  Irrespective of this presumption, for the reasons discussed above, Performance Solutions has

more than adequately demonstrated that the Accused Product is causing and will continue to cause irreparable injury absent an injunction from this Court.

### III.    THE BALANCE OF THE HARDSHIPS

The third factor the Court must consider on a motion for a preliminary injunction is whether the balance of hardships tips in favor of one party or the other.  *See Hybritech*, 849 F.2d at 1457.  In evaluating this factor, "[t]he district court must balance the harm that . . . the non-moving party will incur if the injunction is granted."  *Id*. at 1457.

On opposition, PowX argued in its brief that an injunction would be "devastating" to its business because the "Accused Product comprises the vast majority of PowX's business and, if PowX is enjoined from selling the Accused Product, PowX will be put out of business for good."  Opp. at 24.  However, when the Court inquired into these claims at the May 2, 2024 hearing, counsel for PowX provided no specifics, *see* May 2, 2024 Tr. 77:22–78:11, even with respect to basic relevant facts such as the number of PowX employees that would potentially lose their jobs if the business were to shut down as PowX claims, *see id*. 78:22–79:1.  Furthermore, despite ample opportunity to do so, PowX inexplicably chose not to put in *any* evidence—either by affidavit or by live testimony—from any PowX employee affirmatively explaining the effects any such injunction would have on its business.  Without any evidence before the Court supporting PowX's attorney arguments, and when weighed against the credible evidence of the ongoing damage to Performance Solutions' interests, the balance of the hardships tips decidedly in Performance Solutions' favor.

### IV.    THE IMPACT ON THE PUBLIC INTEREST

The fourth and final factor to be considered on a motion for a preliminary injunction is "the impact of the injunction on the public interest."  *Hybritech*, 849 F.2d at 1458.  "Typically, in

a patent infringement case, although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Id.* (citations omitted). PowX identified the potential for "stifling competition" and "depriv[ing] the public of more product options" as the sole public interests to be harmed by an injunction. *See* Opp. at 24. However, in consideration of Performance Solutions' likelihood of success on its claims of infringement against the Accused Product, it is not in the public interest to allow the public to have access to "product options" that infringe on valid patents. Rather, "competition in violation of lawful patent rights hurts innovation," and "[t]here is a strong public interest in ensuring that valid patents are enforced." *Canon Inc. v. GCC Int'l Ltd.*, 450 F. Supp. 2d 243, 257 (S.D.N.Y. 2006), *aff'd*, 263 F. App'x 57 (Fed. Cir. 2008). The public interest therefore strongly counsels in favor of entering an injunction here.

## CONCLUSION

The Court having considered Defendant Performance Solutions' PI Motion against Plaintiff PowX, the exhibits, testimony, and other evidence submitted in support thereof, and the opposition of PowX to the PI Motion, the Court hereby finds that:

1.      Performance Solutions is likely to succeed on the merits as to its claims of infringement.

2.      Performance Solutions is likely to succeed on the merits as to the validity and enforceability of the Asserted Patents.

3.      Performance Solutions is likely to suffer irreparable harm by PowX due to its infringing activities.

4.      On balance, any potential harm to PowX from discontinuing its infringing activities is outweighed by the likely harm to Performance Solutions.

5.      The public interest favors enjoining PowX from continuing its infringement of the Asserted Patents.

Therefore, **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that PowX is enjoined from engaging in the following acts pending the final determination of this action or until further order of the Court:

a.      Making, using, importing, offering for sale, and/or selling PowX's "Textured Foam Rollers for Muscle Massage" products (the "Accused Product"), or any other identical or substantially similar product, listed on Amazon under the following Amazon Standard Identification Numbers ("ASINs"): B0BSXW4GN4, B0BSXX5KMC, B0BSY8X784, B0BSYDKF4F, B0C1HN15MC, B0C1HQ81CQ, B0C2NFVNPM, B0C2NG1LMW, B0CQZ4KYWS, B0CQZ4LMJ9, B0CQZ585RP, B0CQZ5PCXS, B0CQZ5V5YW, B0CR6W2RN6, B0CRBRP55W, B0CRC4S96F, B0CRC672DJ, B0CRC7473F, B0CRC8K4B7, B0CRC99GK9, B0CRCBQWRZ, B0CRCCFY7S, B0CRCG4KST, B0CRCG7Y2W, B0CRCHZJFJ and B0CRCN5GHR;

b.      Effecting assignments or transfers, forming new entities, or creating and/or utilizing any Amazon storefront, other platform, or other means of making, using, importing, offering for sale, and/or selling the Accused Product for the purposes of circumventing or otherwise avoiding the activities enjoined herein; and

c.      Instructing, aiding, or abetting any other person or business entity from engaging in any activities enjoined under this Order.

As sufficient cause has been shown, pursuant to Fed. R. Civ. P. 65(d)(2)(C), the Court hereby enjoins PowX and its officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with PowX and/or its officers, agents, servants, employees, and attorneys, from engaging in any activity enjoined in this Order.

Dated: June 14, 2024
       New York, New York

SO ORDERED.

_____
MARGARET M. GARNETT
United States District Judge